DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from the Lucas County Court of Common Pleas, which, following a bench trial, found appellant Terry Hayes guilty of aggravated robbery with a firearm specification, a first degree felony, and robbery, a second degree felony. The trial court also accepted appellant's no contest plea and found him guilty on a charge of attempted escape, a fourth degree felony. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} On November 15, 2002, at approximately 3:00 p.m., 15 year old Andrew Coffey was robbed at gunpoint while working at his mother's store, Katie's Baby World, on Lagrange Street in Toledo, Ohio. According to Coffey, the robber was an African-American man with a sock pulled down over much of his face. The robber held a gun to Coffey's face and told him to not "make any moves." Coffey testified that the robbery lasted for 30 to 60 seconds, during which time he was looking at what he could see of the robber's face — from the upper lip down. When the robber turned around to leave, Coffey noticed the robber's hair was pulled back into what he described as a "ball" the size of an orange. The robber was wearing jeans and a waist-length black leather coat, and he made off with approximately $150 to $200. When the police came approximately five minutes later, Coffey described the robber to the police as indicated above. At trial, Coffey described the gun as being black and looking like a semiautomatic.
 {¶ 3} The case lay dormant until March 2003, at which time Officer Andre Cowell of the Toledo Police came to Katie's Baby World to show appellant a photo array. Cowell showed Coffey the array and said (according to Coffey) that "the suspect could be in the pictures or he might not be in the pictures." Coffey testified that he did not feel any pressure to pick someone out from the pictures and that Cowell did not in any way suggest to Coffey that he should pick out the picture of appellant. Coffey testified that he looked at the array for approximately 30 seconds before picking out the picture of appellant. According to Coffey, he chose the picture of appellant "`Cause his hair, and he had a little — `cause he was big and all that and his shoulders were pretty big." On cross-examination, when defense counsel pointed out that appellant's picture did not show appellant's hair pulled back into a ball and asked him what was outstanding about appellant's hair in the picture, Coffey testified "because the other people in the picture have cornrows and he didn't have cornrows." Defense counsel then followed up by asking, "Did you think because the hair wasn't in cornrows like the other 5 people that it had to be the suspect"? Coffey responded, "No, because some of the other guys in there have little faces, and I could tell that he had — he wasn't a small guy when he came in the store." Defense counsel also questioned Coffey about reporting to the police that the robber did not have any facial hair, and Coffey agreed that appellant appeared to have some facial hair in the photo array picture.
 {¶ 4} Lisa Duncan, appellant's neighbor, also testified. She indicated that she lived near appellant during the summer of 2002 and remained in contact with him and his girlfriend, Amanda Karcsak, through October or November 2002. She testified that sometime in October she was at appellant's house and saw appellant sitting with a black gun between his feet. She had never seen appellant carrying the gun, she never asked him any questions about the gun, and appellant never told her that it was his gun.
 {¶ 5} Detective Rick Molnar of the Toledo Police testified next. According to Molnar, he was initially the lead investigator on the case, and while he was acting as such, appellant contacted Sergeant Maxwell of the Toledo Police. Appellant told Maxwell that he (appellant) wanted to speak with him about the case and that he (appellant) had "solved the case." Maxwell passed this information on to Molnar, and Molnar met with appellant. After appellant signed a written waiver of his Miranda rights, appellant told Molnar that he had an alibi — he was taking his girlfriend, Amanda Karcsak, to work at the time of the robbery. Appellant indicated that he dropped Karcsak off at 3:00 p.m.
 {¶ 6} On cross-examination, Molnar conceded that he never recovered a gun, he never recovered a black leather coat, and he never recovered any jeans. He also conceded that his own gun is black and black is a common color for a gun.
 {¶ 7} Korrin Lampkin, an employee at J E Home Improvement where Amanda Karcsak worked, was the next to testify. She testified about Karcsak's time sheet for the day of the robbery. According to the records, which were initialed by the marketing director, Karcsak worked from 2:30 p.m. to 8:15 p.m. on that day.
 {¶ 8} Officer Andre Cowell of the Toledo Police testified about the photo array he showed to Coffey in March 2003. Cowell testified that it took Coffey three to four seconds to pick out appellant's picture.
 {¶ 9} Amanda Karcsak testified next. Karcsak indicated that appellant is her boyfriend. She testified that after appellant was arrested on another charge, he asked her to check her calendar for the day of the robbery in this case to see where they might have both been on that day. She indicated that at about 3:00 p.m. on the day of the robbery she was at work. Karcsak agreed after looking at her time records that she signed in at 2:30 on that day. However, she testified that her practice is to not sign in immediately upon arriving at work. Before she signs in, she gets her two-way radio, uses the restroom, and gets something to drink before going to her desk and signing in.
 {¶ 10} Karcsak testified about appellant's appearance both at the time of trial and at the time of the robbery. She testified that in the fall of 2002, the time of the robbery, appellant's hair was long and in braids. At the time of trial his head was shaven. When asked if appellant ever wore his hair "tied back in kind of in a bun or a ball at the back of his head," Karcsak explained that he sometimes, though seldom, wore it in a ponytail but not in a ball. She stated that he owned a black leather coat in the fall of 2002, but that it was longer than the waist-length coat Coffey described the robber wearing. According to Karcsak, appellant's leather coat came to between his knees and his waist. She also testified that appellant owned a small black gun, but she could not remember if he owned it in the fall of 2002. Karcsak also remembered appellant having large sums of money in the fall of 2002. She testified that she asked appellant about the money, and he indicated that he earned it doing side jobs for his friends. She stated that appellant never gave her a gun to keep for him, but she found some ammunition (three or four rounds) in a "penny jar" in her home. She later gave the ammunition to the police. When asked whether appellant ever told her that he "got rid of" his gun, appellant answered affirmatively. When asked when appellant told her this, Karcsak responded, "I believe he said he lost it in the beginning of November." When pressed further about whether appellant ever told her that he "pitched" the gun or whether she ever told police that appellant "pitched" the gun, Karcsak responded that "there was a story similar to that" that appellant told her. She later told this to the police.
 {¶ 11} On cross-examination, Karcsak indicated that appellant was doing odd jobs in the fall of 2002, such as working on cars and houses and that he was getting paid for it. The "large sums of money" to which she referred on direct examination was "a couple of hundred dollars." She also testified that the last time she saw appellant with a gun was in the summer of 2002; she remembered that it was still warm outside and appellant was wearing shorts. She then gave testimony different than her direct testimony; she indicated that appellant "lost" his gun in October 2002, not November as she had previously testified. Karcsak also testified on cross-examination about appellant's hair. She again indicated that he sometimes wore his hair in a ponytail, but it was not long enough to form a "ball" the size of an orange. Upon questioning from the court, Karcsak testified that after appellant was incarcerated on a different charge but before he was charged in this case, appellant met a man in jail who confessed to the robbery in the instant case. Upon this man's release, he implicated appellant in the robbery because he did not want to go back to prison.
 {¶ 12} Both sides rested and, after some deliberation, the trial court announced its decision from the bench. In explaining its decision, the court noted that Coffey was certain that appellant was the robber. Also important to the court was the detail with which Coffey was able to describe the robber, and the ease with which he was able to pick appellant out of the photo array. The court also took into account Karcsak's testimony that appellant owned a black leather coat and that appellant asked her to check her calendar for the day of the robbery. The court also noted the difference in Karcsak's and Duncan's testimony: Karcsak testified that she last saw appellant's gun in the summer of 2002, and Duncan (the neighbor) testified that she saw it as late as October 2002. The trial court indicated that it credited Duncan's testimony since she was a disinterested witness. The court also noted Karcsak's testimony that in the fall of 2002, appellant had in his possession roughly the same amount of cash as was taken in the robbery. Taking all of this evidence together, along with all reasonable inferences drawn from the testimony, the court found that the state had proven aggravated robbery beyond a reasonable doubt. As for the gun specification, the court found beyond a reasonable doubt that appellant used a firearm in the commission of the aggravated robbery and that it was operable, given that appellant pointed the gun at Coffey and threatened physical harm upon him by telling him not to move. The court also noted that ammunition was found in Karcsak's apartment. Finally, the court found appellant guilty of robbery, which was a separate count in the indictment. Later, at a sentencing hearing, the court sentenced appellant to seven years on the aggravated robbery charge and seven years on the robbery charge, to be served concurrently. The court also ordered appellant to a consecutive three-year term for the firearm specification. Finally, appellant was sentenced to a 17-month concurrent sentence on the attempted escape charge.
 {¶ 13} Appellant now appeals, setting forth the following assignments of error:
 {¶ 14} "I. The court's verdict is against the manifest weight of the evidence.
 {¶ 15} "II. The court's verdict is legally insufficient because there is no evidence regarding one of the elements.
 {¶ 16} "III. Appellant was denied his right to effective counsel."
 {¶ 17} In his first assignment of error, appellant contends that the trial court's judgment is against the manifest weight of the evidence. This court has recently set out the standard for reversal on a manifest weight challenge when the case has been tried to the bench. We stated,
 {¶ 18} "In a bench trial, the court assumes the fact-finding function of the jury. Accordingly, to warrant reversal from a bench trial under a manifest weight of the evidence claim, it must be determined that the court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. State v. Thompkins
(1997), 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. Due deference must be accorded the findings of the trial court because the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony. State v. Binford, 8th Dist. No. 81723, 2003-Ohio-3021." State v. Archie, 6th Dist. Nos. L-02-1225, L-02-1262, 2004-Ohio-4844, at ¶ 8.
 {¶ 19} Appellant contends that Coffey's identification was questionable since he was only able to observe the robber for less than a minute and since Coffey was not able to supply a detailed description of the robber, such as the color of his shirt, a description of the gun (other than it being black), and details about the robber including age, height, weight, or voice characteristics. Appellant also points out that the police had no "corroborating or forensic evidence," leading the Toledo Police Division to place the case in an inactive status for several months. Further, there was no confession. Appellant also points to Coffey's youth, arguing that Coffey's youth "throws his ability to observe and process data into even greater scrutiny."
 {¶ 20} Certainly, this case rests on circumstantial evidence. However, circumstantial evidence has the same probative value as direct evidence. State v. Treesh (2001), 90 Ohio St.3d 460,485, certiorari denied (2001), 533 U.S. 904. When all of the pieces of circumstantial evidence are put together, we cannot say that the trier of fact "clearly lost its way" and created a "manifest miscarriage of justice" warranting a new trial. SeeThompkins, 78 Ohio St.3d at 387. The evidence showed that Coffey was able to see the bottom portion of the robber's for a full 30 to 60 seconds and that he noticed details such as the robber's long hair, his leather coat, and his black gun. There was testimony that appellant owned a black gun and then "pitched it" around the time of the robbery. Appellant also owned a black leather coat around the time of the robbery. There was also evidence that appellant had in his possession at the time of the robbery the approximate amount of cash taken in the robbery. Coffey readily identified appellant as the robber after viewing, for no longer than 30 seconds, a photo array containing appellant's picture. Finally, though appellant attempted to establish an alibi, there was evidence that appellant dropped his girlfriend off sometime before 2:30 p.m. on the day of the robbery and the robbery took place between 2:30 and 3:00 p.m.
 {¶ 21} On the other hand, there was evidence that appellant's leather coat was longer than the one described by Coffey, that Coffey did not describe the robber as having any facial hair and appellant had facial hair in the photo array, that appellant was performing side jobs around the time Karcsak noticed him having a couple of hundred dollars in cash, and that appellant may have lost his gun as early as October 2002, a month before the robbery.
 {¶ 22} Based on a review of the evidence as a whole, we cannot say that the trial court's judgment was against the manifest weight of the evidence. Appellant's first assignment of error is found not well-taken.
 {¶ 23} In his second assignment of error, appellant contends that the trial court's judgment was insufficient because there was no evidence on one of the elements specifically, the use of an operable firearm. "Weight of the evidence" and "sufficiency of the evidence" are two distinct legal concepts. Thompkins,78 Ohio St.3d 380, at paragraph two of the syllabus. "Sufficiency of the evidence" is a legal standard that the court applies to determine if a case should go to a jury or to determine whether there is sufficient evidence to support a verdict. Id. at 386, quoting Black's Law Dictionary (6 Ed. 1990) 1433. According to the Supreme Court of Ohio, "sufficiency is a test of adequacy."Thompkins, 78 Ohio St.3d at 386.
 {¶ 24} Appellant's indictment included a firearms specification under R.C. 2941.145(A). That section allows for an additional three-year prison term if the indictment specifies (and the state proves) that:
 {¶ 25} "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense. * * *."
 {¶ 26} R.C. 2941.145(D) indicates that the term "firearm," as used in subsection (A) has the same meaning as in R.C. 2923.11. R.C. 2923.11(B)(1) defines "firearm" as:
 {¶ 27} "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. `Firearm' includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable."
 {¶ 28} Further, R.C. 2923.11(B)(2) provides that, in determining whether a firearm is "capable of expelling or projecting one or more projectiles," the trier of fact may rely on circumstantial evidence, including "the representations and actions of the individual exercising control of the firearm."
 {¶ 29} The Ohio Supreme Court has addressed the "operability" requirement for the firearm specification. The Ohio Supreme Court held:
 {¶ 30} "The state must present evidence beyond a reasonable doubt that a firearm was operable at the time of the offense before a defendant can receive an enhanced penalty pursuant to R.C. 2929.71(A). However, such proof can be established beyond a reasonable doubt by the testimony of lay witnesses who were in a position to observe the instrument and the circumstances surrounding the crime. (State v. Gaines (1989),46 Ohio St.3d 65, 545 N.E.2d 68, modified.)" State v. Murphy (1990),49 Ohio St.3d 206, syllabus.[1]
 {¶ 31} The court in Murphy also made clear that an examination of the firearm is not essential in order to convict on the firearm specification. Id. at 209.
 {¶ 32} The Ohio Supreme Court took up the issue again inThompkins. The court in Thompkins, relying, in part, on R.C.2923.11(B)(2), held that circumstantial evidence may be used to establish the operability of a firearm and that implicit threats may also be considered. Thompkins, 78 Ohio St.3d 380, at paragraph one of the syllabus. Therefore, the court found that the defendant, who pointed a gun at the victim, told her that he was committing a hold-up, and told her to be "quick, quick, quick," committed the offense with an operable firearm. In holding that this implicit threat of harm was sufficient to establish operability, the court noted that to require an explicit threat would eviscerate the purpose of the statute (which is, according to the court, to send a message to criminals that using a weapon would result in three extra years). Id. at 385. Requiring an explicit threat would allow a criminal to avoid an additional three years by not saying anything to the victim and not discharging the weapon. Id.
 {¶ 33} This case is factually similar to Thompkins. Here, appellant put a gun in Coffey's face, demanded money, and told him not to "make any moves." Coffey indicated that he feared for his life. We find the evidence more than sufficient to prove that the firearm was operable. Therefore, appellant's second assignment of error is found not well-taken.
 {¶ 34} In his third assignment of error, appellant contends that he was denied effective assistance of counsel because trial counsel did not object to, or move to suppress, the photo array, did not object to the in-court identification, and allowed appellant to plead guilty to attempted escape when he was "probably not technically guilty." The Supreme Court of Ohio has held that courts should apply a two-part test to determine ineffective assistance claims. According to the Supreme Court:
 {¶ 35} "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." State v.Bradley (1989), 42 Ohio St.3d 136, at paragraph two of the syllabus, certiorari denied (1990), 497 U.S. 1011, citingStrickland v. Washington (1984), 466 U.S. 668.
 {¶ 36} The court must defer to the strong presumption that counsel's performance falls within the wide range of reasonable professional performance. Bradley, 42 Ohio St.3d at 142. Even if counsel's performance falls outside the objective standard of reasonable representation, the court shall not reverse unless counsel's ineffectiveness resulted in prejudice. Id. In order to show prejudice warranting reversal, the defendant must show that there is a reasonable probability that, but for counsel's ineffectiveness, the outcome of the proceeding would have been different. Id., quoting Strickland, 466 U.S. at 694.
 {¶ 37} The Court in Bradley derived guidance from theStrickland decision on how to proceed with the two-part analysis for ineffective assistance claims. In Strickland, the United States Supreme Court stated:
 {¶ 38} "Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697, quoted in Bradley,42 Ohio St.3d at 143.
 {¶ 39} We will address the photo array first. Courts apply a two-part test to determine if an identification should be suppressed. The Ohio Supreme Court has held:
 {¶ 40} "When a witness has been confronted with a suspect before trial, due process requires a court to suppress her identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances."State v. Waddy (1992), 63 Ohio St.3d 424, 438, rehearing denied (1992), 63 Ohio St.3d 1470, certiorari denied (1992),506 U.S. 921, citing Neil v. Biggers (1972), 409 U.S. 188.
 {¶ 41} Therefore, the two-part test is whether the identification is: (1) unduly suggestive, and (2) unreliable. Id. To determine whether the identification is unreliable, the court should consider the following factors:
 {¶ 42} "the witness's opportunity to view * * * the defendant during the crime, the witness's degree of attention, the accuracy of the witness's prior description of the suspect, the witness's certainty, and the time elapsed between the crime and the identification." Id. at 439. The Ohio Supreme Court added that an identification is unreliable where suggestive procedures created "a very substantial likelihood of irreparable misidentification." Id. at 439, citing Neil, 409 U.S. at 199-200.
 {¶ 43} The first question is whether the identification was suggestive. On its face, the photo array contains six pictures of African American men with similar facial features and similar skin tone. They all have facial hair. In the array, appellant clearly has long hair; three others clearly have hair long enough to be braided; the other two have hair of an indeterminate length. We see nothing in the photos that makes appellant stand out among the others. Also, there was testimony that the photo array was not presented to Coffey in any way that would suggest to him that he should pick appellant. In sum, we find that the photo array was not suggestive.
 {¶ 44} Even if we were to find that the photo array was suggestive, the inquiry does not end there. There must also be evidence that the identification was unreliable. First, we are to consider Coffey's opportunity to view the robber and the level ofttention he paid to the robber. Coffey testified that he looked at the robber during the entire hold-up, which lasted 30 to 60 seconds. Because the robber was wearing a sock on his face, Coffey was only able to see the bottom portion of his face. Courts have found identifications reliable even when the witnesses saw their assailants for only a few seconds. In one case, the victim reported seeing her assailant for a "brief second, might have been a little more than a brief second."State v. Norton (July 29, 1993), Tenth Dist. No. 93AP-194, affirmed (1994), 69 Ohio St.3d 1448. Similarly, where a witness saw the assailant for "several seconds, in broad daylight, from approximately twelve feet away," the court found the identification reliable. State v. Mitchell (Nov. 15, 1995), Ninth Dist. No. 17029, appeal dismissed (1998),81 Ohio St.3d 1414. Here, Coffey observed the robber for a full 30 to 60 seconds — the entire duration of the robbery.
 {¶ 45} Next, we are to consider the accuracy of Coffey's previous description of the robber. Coffey described the robber as a large African American man with long hair, which accurately describes the appellant. However, Coffey did not mention any facial hair; appellant had facial hair in the photo array but may or may not have had any at the time of the robbery.
 {¶ 46} We are also to consider Coffey's certainty in identifying the robber in the photo array. Coffey was very certain that appellant was the robber, and he identified him in the photo array in under 30 seconds.
 {¶ 47} Finally, we are to consider the amount of time that elapsed between the robbery and the identification. Here, approximately four months had elapsed. The Ohio Supreme Court did not find an identification unreliable where two months had elapsed, noting that in Neil, the United States Supreme Court found that "factors favoring reliability outweighed a seven-month gap." Waddy, 63 Ohio St.3d at 440, citing Neil,409 U.S. at 198.
 {¶ 48} Viewing the record as a whole, while Coffey was not able to see the robber's entire face and four months had elapsed between the time of the robbery and the pretrial identification, we find that the identification as a whole was reliable. Coffey watched the robber intently for a full 30 to 60 seconds, he did not hesitate in picking appellant's photo out of the photo array, and he was very certain that appellant was the robber.
 {¶ 49} Since the photo array was not unduly suggestive and was reliable, counsel was not ineffective in not filing a motion to suppress it. For the same reasons, counsel was not ineffective in failing to object to the in-court identification. In addition, while counsel did not file a motion to suppress the identification or object to the identification at trial, he ably cross-examined Coffey about his identification. We therefore find that trial counsel was not ineffective in handling the identification issues in this case.
 {¶ 50} Appellant also contends that trial counsel was ineffective in allowing him to plead guilty to attempted escape. Appellant, in his brief, does not point to any portion of the record where this error occurred except to point out certain pages of the sentencing transcript where his attorney made representations about this charge after appellant had already pleaded guilty. We may disregard assignments of error (or portions of assignments of error) where the party raising it "fails to identify in the record the error on which the assignment of error is based." App.R. 12(A)(2). We therefore find appellant's third assignment of error not well-taken.
 {¶ 51} Upon due consideration, we find that appellant was not prejudiced or prevented from having a fair trial, and the decision of the Lucas County Court of Common Pleas is affirmed. Pursuant to App.R. 24, appellant is ordered to pay the court costs of this appeal.
Judgment affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Knepper, J., Pietrykowski, J., Singer, J., Concur.
[1] R.C. 2929.71 has since been repealed, but analogous provisions are found in R.C. 2929.14, relating to prison terms.